# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DENNIS OTENG,**

                                             **CASE NO. 2:16-CV-1181**

       **Petitioner,**                              **JUDGE JAMES L. GRAHAM**

                                             **Magistrate Judge Elizabeth P. Deavers**

       **v.**

**WARDEN, ROSS**
**CORRECTIONAL INSTITUTION,**

       **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254. This matter is before the Court on the *Petition*, Respondent's *Return of Writ*,

Petitioner's *Reply*, and the exhibits of the parties. For the reasons that follow, the Magistrate

Judge **RECOMMENDS** that this action be **DISMISSED**.

### I.

### Facts and Procedural History

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of

the case as follows:

> In the early morning hours of January 5, 2013, Kingsley Owusu
> was shot and killed in the parking lot of the Filipino Center on
> Westerville Road in Columbus, Ohio. The victim's best friend,
> Benjamin Appiah, described the events that lead to Owusu's death
> as follows. In the late evening of January 4, 2013, Owusu and his
> friend Gabe, also known as G-money, picked him up at home and
> traveled to Lounge 62 in Westerville. When they arrived at Lounge
> 62, they ran into a friend by the name of David Aseidu who was at
> the lounge with his friend Andrea d'Almeida. Appiah testified that
> he and all these other individuals hale from the West African
> nation of Ghana. He described the Ghanaian community in

Columbus as a fairly tight knit group, and he stated that most members of the community know each other.

At Aseidu's suggestion, the group of five left Lounge 62 and headed to the Filipino Center to attend a New Year's party co-hosted by Appiah's former girlfriend, Alexis Wellington, and her best friend, Helen Mamo. According to Appiah, he and Wellington had dated "on and off" for approximately one and one-half years prior to that time. (Tr. 335.) Appiah was also aware that appellant was the father of Wellington's six-year old daughter, Michelle.

When they arrived at the party, G-money parked his vehicle at the back of the parking lot. Aseidu, who was traveling with d'Almeida, parked their vehicle closer to the main entrance of the Filipino Center. Appiah testified that he exited the vehicle and began walking toward the main entrance, just behind Owusu and G-money. As G-money and Owusu crossed the parking lot, a man by the name of Yaw Boayke confronted Owusu and began yelling at him in an "angry tone." (Tr. 353.) G-money stepped between the two and then struck Boayke in the face with his forehead. The two men fell to the ground wrestling before Appiah was able to pull G-money off of Boayke.

When Boayke returned to the Filipino Center, he was bleeding from the mouth, and he told Mamo that G-money had head-butted him. By this time, Appiah had entered the Filipino Center to check out the party, while G-money and Owusu waited outside. Appiah then saw appellant and "his crew" of four or five men rush past him toward the parking lot. (Tr. 371.) Appiah recognized a man he knew as Daniel, also known as D.J., and another man he knew as Stevenson following appellant out the main entrance.

At that point, Appiah went out to the parking lot where he saw appellant approaching Owusu with a handgun raised and pointed at him. Appiah got between Owusu and appellant in an effort to diffuse the situation. When he turned away from appellant to face Owusu, he saw that Owusu was holding a small handgun. Appiah pleaded with his friend to give him the gun. He told Owusu "[l]et's just leave the scene." (Tr. 370.) According to Appiah, Owusu handed him the gun.

At that moment, Appiah heard a gun shot ring out behind him, and he began running toward the main entrance of the Filipino Center to get away. When he reached the entrance, he realized Owusu was not with him. Concerned for his friend, Appiah turned to head back outside, but he was momentarily delayed by a security guard.

When Appiah made it outside, he saw appellant and Owusu facing one another about arms length apart with appellant pointing a handgun at Owusu. Appiah testified that he was standing about ten feet away from the two men with a clear view when he saw appellant fire a shot at Owusu.

According to Appiah, the shot struck Osuwu in the upper body, and he immediately fell to the ground. Appellant then rushed over to Owusu and began kicking him in the head. When appellant broke off his assault and ran, Appiah tried to fire a shot from Owusu's gun, but it jammed. Appiah ejected two live shells from the gun and then began running after appellant, shooting the gun in the air as appellant fled the parking lot in his black BMW.

Owusu died as a result of a single gunshot wound to the chest. Columbus Police arrested appellant on January 6, 2013, at the home of his friend Kwame Kusi.

The Franklin County Grand Jury indicted appellant on one count of murder, in violation of R.C. 2903.02(A), and one count of felony murder, in violation of R.C. 2903.02(B). A jury found appellant guilty of both charges in the indictment. The trial court merged the two counts for purposes of sentencing and imposed a prison term of 15 years to life, consecutive to a mandatory 3–year firearm specification.

Appellant filed a timely notice of appeal to this court on June 11, 2014.

II. ASSIGNMENTS OF ERROR

Appellant's assignments of error are as follows:

[I.] THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO PROVIDE A QUALIFIED INTERPRETER TO TRANSLATE RECORDED TELEPHONE CALLS INVOLVING APPELLANT SPEAKING HIS NATIVE LANGUAGE, IN VIOLATION OF APPELLANT'S RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTION.

[II.] APPELLANT WAS DENIED HIS RIGHTS TO THE PRESUMPTION OF INNOCENCE, TO A FAIR TRIAL AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE JURY HEARD

EVIDENCE REGARDING THE EXECUTION OF SEARCH WARRANTS.

[III.] APPELLANT WAS DENIED HIS RIGHTS TO THE PRESUMPTION OF INNOCENCE, TO A FAIR TRIAL AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS WHEN THE JURY HEARD EVIDENCE OF APPELLANT'S INCARCERATION PRIOR TO TRIAL.

[IV.] THE PROSECUTION COMMITTED MISCONDUCT BY ASKING LEADING QUESTIONS, THEREBY DENYING APPELLANT HIS RIGHTS TO A FAIR TRIAL AND TO DUE PROCESS CONTRARY TO THE OHIO AND UNITED STATES CONSTITUTIONS.

[V.] APPELLANT'S RIGHTS TO CONFRONT THE WITNESSES AGAINST HIM, TO A FAIR TRIAL, AND TO DUE PROCESS AS GUARANTEED BY THE U.S. AND OHIO CONSTITUTIONS WERE VIOLATED BY THE ADMISSION OF HEARSAY EVIDENCE.

[VI.] THE ADMISSION OF OTHER–ACTS TESTIMONY VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

[VII.] THE TRIAL COURT IMPROPERLY INSTRUCTED THE JURY ON CAUSATION IN VIOLATION OF APPELLANT'S DUE PROCESS RIGHTS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

[VIII.] STATEMENTS MADE BY THE PROSECUTOR CONSTITUTED PROSECUTORIAL MISCONDUCT THEREBY DENYING APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW, IN VIOLATION OF APPELLANT'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION, AND SECTIONS 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[IX.] APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES

CONSTITUTION, AND SECTION 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

[X.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

*State v. Oteng,* No. 14AP-466, 2015 WL 1432556, at *1-3 (Ohio App. 10th Dist. March 31, 2015). On March 31, 2015, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner filed a timely appeal with the Ohio Supreme Court. He raised four propositions of law. He asserted that the trial court abused its discretion by failing to provide an interpreter to translate recorded telephone calls; that he was denied a fair trial due to admission of evidence regarding execution of search warrants; that he was denied a fair trial based on prosecutorial misconduct due to the use of leading questions; and that he was denied the effective assistance of trial counsel. (ECF No. 10-1, PageID# 305.) On September 30, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Oteng,* 143 Ohio St.3d 1481 (2015). On June 16, 2015, Petitioner also filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). (ECF No. 10-1, PageID# 358.) He asserted therein that he had been denied the effective assistance of counsel because his attorney failed to raise on appeal claims of prosecutorial misconduct due to the withholding of statements and promises made to the mother of his child, lack of DNA evidence or forensic testing, and the use of improper identification procedures. (PageID# 361-65.) On July 28, 2015, the appellate court denied the Rule 26(B) application. (PageID# 376.) On October 28, 2015, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (PageID# 396.)

On August 13, 2014, Petitioner filed a motion for a new trial. (PageID# 397.) He asserted that he was denied a fair trial because his feet were shackled during trial. (*See* PageID# 421.) On October 15, 2015, the trial court denied the motion for a new trial as untimely. (PageID# 421-22.) On April 26, 2016, the appellate court *sua sponte* dismissed the appeal for failure to file an appellate brief. (PageID# 431.)

On December 16, 2016, Petitioner filed this *Petition* pursuant to 28 U.S.C. § 2254. He asserts that he was denied a fair trial because the trial court failed to provide a qualified interpreter to translate recorded telephone conversations between Petitioner and a prosecution witness (claim one); that he was denied his right to the presumption of innocence and due process by the admission of evidence regarding execution of search warrants (claim two); that he was denied a fair trial due to prosecutorial misconduct based on the use of leading questions (claim three); and that he was denied the effective assistance of trial counsel (claim four). It is the position of the Respondent that Petitioner's claims are procedurally defaulted or otherwise fail to provide a basis for relief.

## II.

Before turning to the merits of Petitioner's claims, the Court turns first to procedural issues. As set forth more fully below, the Magistrate Judge finds that claim two is procedurally defaulted and that Petitioner failed to exhaust his remedies with respect to claim one.

### Procedural Default

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so,

but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6, 103 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). Where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas. . . ." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted. That means that, if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. In the words used by the Supreme Court in *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case-that is, they are "procedurally defaulted."

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim has been waived by the petitioner's failure to observe a state procedural

rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause sufficient to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, however, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards,* 529 U.S. at 452 (quoting *Murray,* 477 U.S. at 479). That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). Or, if procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the

ineffective-assistance claim itself." *Edwards,* 529 U.S. at 450–51. The Supreme Court explained the importance of this requirement:

> We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to "'protect the integrity' of the federal exhaustion rule." *Id.,* at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id.,* at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].'" Id., at 854, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950) ).

*Id.* at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default has occurred, it must not consider the merits of the procedurally defaulted claim unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in

a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray,* 477 U.S. at 495–96).

In claim two, Petitioner asserts that he was denied a fair trial due to the admission of evidence regarding the execution of search warrants. Petitioner raised this claim on direct appeal; however, the state appellate court reviewed the issue for plain error only, due to Petitioner's failure to object:

> In his second assignment of error, appellant argues that the trial court denied him his constitutional and statutory right to the presumption of innocence by the erroneous admission of evidence regarding search warrants issued by the court during the investigation of Owusu's murder. The state points out that appellant's trial counsel did not object to this evidence.
>
> Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." This rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial: (1) there must be an error, *i.e.*, a deviation from a legal rule, (2) the error must be plain so that it constitutes an obvious defect in the trial proceedings, and (3) the error must have affected substantial rights such that the trial court's error must have affected the outcome of the trial. *State v. Humberto,* 196 Ohio App.3d 230, 2011–Ohio–3080, ¶ 28 (10th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). The decision to correct a plain error is discretionary and should be made "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* at ¶ 29, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.
>
> We perceive no plain error on the part of the trial court with regard to the admission of this evidence. Appellant has not cited, nor has the court found in its own research, a single case from this or any other Ohio court holding either that evidence regarding search warrants issued during the investigation of a crime is, per se, inadmissible as evidence at the trial of the matter or that the erroneous admission of such evidence deprives a criminal defendant of his or her statutory and constitutional right to the presumption of innocence. Moreover, appellant does not contend that the trial court failed to properly instruct the jury regarding the

presumption of innocence and the burden of proof. We are to presume that the jury followed the trial court's instructions. *State v. Hancock*, 108 Ohio St.3d 57, 2006–Ohio–160.

*State v. Oteng,* 2015 WL 1432556, at *5. Petitioner thereby has waived this claim for review in these proceedings. The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). As explained by the United States District Court for the Northern District of Ohio:

> Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), cert. denied, 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005) (citing *State v. Smith*, 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.; Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Stojetz v. Ishee*, 2006 WL 328155 *12 (S.D. Ohio Feb.10, 2006).
>
> A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams*, 380 F.3d at 968; *Hinkle,* 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle*, 271 F.3d at 244 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

*Adams v. Bradshaw*, 484 F.Supp.2d 753, 771 (N.D. Ohio 2007).

Petitioner may still secure review of the merits of this claim if he demonstrates cause for his failure to follow the state procedural rule, as well as actual prejudice from the constitutional violations that he alleges. "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing

*Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). However, a petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007). Petitioner has failed to establish cause and prejudice for his procedural default of claim two.

The United States Supreme Court has held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [a petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray,* 477 U.S. at 496. In *Schlup,* the Supreme Court held that a credible showing of actual innocence was sufficient to authorize a federal court in reaching the merits of an otherwise procedurally-barred habeas petition. *Schlup,* 513 U.S. at 317. However, the actual innocence claim is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id*. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The Court of Appeals for the Sixth Circuit explained the exception as follows:

The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id*. at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup,* 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id*. at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted). Petitioner does not meet these standards here. After an independent review of the record, the Court does not deem this to be so extraordinary a case as to relieve petitioner of his procedural default.

Claim two is procedurally defaulted.

### Exhaustion

In order to satisfy the exhaustion requirement in habeas corpus, a petitioner must fairly present the substance of each constitutional claim to the state courts as a federal constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Although the fair presentment requirement is a rule of comity, not jurisdiction, *see Castille v. Peoples*, 489 U.S. 346, 349 (1989); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999), it is

rooted in principles of comity and federalism designed to allow state courts the opportunity to correct the State's alleged violation of a federal constitutional right that threatens to invalidate a state criminal judgment. In the Sixth Circuit, a petitioner can satisfy the fair presentment requirement in any one of four ways: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000). Further, general allegations of the denial of a constitutional right, such as the right to a fair trial or to due process, are insufficient to satisfy the "fair presentment" requirement. *Id*.

In claim one, Petitioner asserts that he was denied a fair trial because the trial court failed to provide a qualified interpreter to translate portions of recorded telephone calls involving Petitioner speaking his native language, "Twi" with prosecution witness Alexis Wellington. However, Petitioner presented this claim to the state appellate court as one regarding the alleged violation of state law only. Petitioner generally claimed that the trial court's ruling denied him his constitutional right to a fair trial and due process, but he referred to only state law in support, claiming that the trial court's ruling violated state law and evidentiary rules. (ECF No. 10-1, PageID# 127-130.) He referred to *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir. 1985), in support of his argument that the trial court could have instructed the jury to consider the recorded conversation, and not Wellington's translation of it, but not as a basis to

support any federal due process claim.[1]  The state appellate court likewise addressed the issue as

a matter of state law:

> [A]ppellant contends that the trial court erred when it refused to appoint a foreign language interpreter to translate appellant's tape-recorded telephone conversation with Wellington. We disagree.
>
> During Wellington's direct examination, Wellington testified that she received several telephone calls from appellant prior to the trial of this matter. Wellington testified that in those telephone conversations, appellant attempted to persuade her not to cooperate with the police or the prosecution. According to Wellington, appellant was trying to manipulate her testimony.
>
> Wellington testified that she spoke in English during her telephone conversations with appellant, but that he spoke to her both in English and in the native tongue of Ghana, known as Twi. Wellington testified that she learned Twi growing up in a home where both of her parents spoke the language. Wellington stated that she is able to understand Twi "fluently" but that she cannot speak the language herself. (Tr. 617.) Following Wellington's testimony regarding the content of her telephone conversations with appellant, plaintiff-appellee, the State of Ohio, played excerpts of the tape-recorded telephone conversation for Wellington as she related to the jury what appellant was saying.
>
> Appellant objected to the tape-recorded telephone conversation on the statements. Although counsel was not sure of the legal basis for the objection, it is clear from the transcript that counsel was not concerned that his client would be unable to understand the statements made in Twi. The trial court determined that a foreign language interpreter was not required under the circumstances. The court noted that the state had provided counsel with the audiotapes in the discovery process. The trial court also stated that had appellant needed to employ an independent interpreter to transcribe the audiotapes prior to trial, "the Court would have made that available." (Tr. 671.) Appellant made no such request.
>
> In 2013, the Supreme Court of Ohio adopted Sup.R. 88 regarding the use of interpreters. The rule states in relevant part as follows:

---

[1] The jury could not have considered the actual recorded conversation, as it apparently had never been translated.

(A) When appointment of a foreign language interpreter is required.

A court shall appoint a foreign language interpreter in a case or court function in either of the following situations:

(1) A party or witness who is limited English proficient or non-English speaking requests a foreign language interpreter and the court determines the services of the interpreter are necessary for the meaningful participation of the party or witness;

(2) Absent a request from a party or witness for a foreign language interpreter, the court concludes the party or witness is limited English proficient or non-English speaking and determines the services of the interpreter are necessary for the meaningful participation of the party or witness.

(Emphasis added.)

In this instance, Wellington is an English speaking witness who also understands Twi; appellant speaks both English and Twi. The evidence does not show that either Wellington or appellant is limited English proficient or non-English speaking. Under such circumstances, Sup.R. 88 does not require the appointment of a foreign language interpreter. [FN1] Moreover, we fail to see how the absence of an interpreter prevented appellant's meaningful participation in the proceedings. There is no question that appellant was present in the courtroom as Wellington testified. Had Wellington misinterpreted appellant's recorded statements, he was in the best position to assist his defense counsel in shaping an effective cross-examination.

FN1: R.C. 2311.14(A)(1) contains similar provisions and provides in relevant part as follows:

> Whenever because of a hearing, speech, or other impairment a part to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person.

(Emphasis added.)

Moreover, we find appellant suffered no prejudice resulting from the fact that no foreign language interpreter was appointed. Wellington had previously testified, without objection, of her own

recollection of the general content of the telephone calls and her impression of appellant's intentions. Appellant's trial counsel acknowledged as much when he stated: "if she's testifying to the substance of the conversation of what's being said, then playing the recordings is nothing but cumulative." (Tr. 597.) Although the tape-recorded telephone conversations were clearly relevant when offered either as corroboration of Wellington's claim that appellant had contacted her by telephone or to refresh Wellington's recollection as to the content of the conversations, the fact remains that the jurors did not speak Twi. Consequently, Wellington's translation of appellant's recorded statements, as they were played in the courtroom, is no more probative of what appellant said to her than her own recollection to which she testified. In any case, Wellington's testimony was admissible evidence of her pretrial conversations with appellant, and it was for the jury to determine whether they believed or disbelieved Wellington's testimony regarding appellant's prior statements.

For the foregoing reasons, appellant's first assignment of error is overruled.

*State v. Oteng*, 2015 WL 1432556, at *3-4. Moreover, Petitioner has failed to establish cause for his failure to present a federal claim to the state appellate court. Petitioner therefore has waived any federal constitutional claim for review in these proceedings.

Further, Petitioner's claim regarding the alleged violation of state law does not provide him a basis for relief. *See Wilson v. Corcoran,* 562 U.S. 1, 4 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.") (citing 28 U.S.C. § 2254(a) (emphasis in original)). "[W]e have repeatedly held that "'federal habeas corpus relief does not lie for errors of state law.'" *Id.* (citing *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (internal citation omitted)).

Notably, the Supreme Court has not held that the Constitution guarantees the right to the translation of all witnesses at trial by an interpreter in state court proceedings. *Nguyen v. Booker*, 496 F. App'x 502, 506 (6th Cir. 2012).

Indeed, other courts to have considered scenarios similar to Nguyen's have all noted that the Supreme Court has not spoken to this issue. *See Celebisoy v. Brunson*, No. C08–5739–FDB, 2009 WL 2473479, at *7 (W.D.Wash. Aug. 10, 2009) ("[T]he United States Supreme Court has never explicitly recognized a constitutional right to a court-appointed interpreter."); *Nguyen v. Tilton*, No. 06–01414–JSW, 2009 WL 839278, at *19 (N.D. Cal. Mar. 30, 2009) ("Petitioner argues that due process requires the appointment of an interpreter in criminal proceedings where it is necessary. . . . However, there is no clearly established federal law extending any such right to witnesses."); *see also United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001) ("The United States Supreme Court has yet to recognize the right to a court-appointed interpreter as a constitutional one.") Absent such controlling authority from the Supreme Court, we may not find that the Michigan Court of Appeals decision regarding the lack of an interpreter is "contrary to" clearly established federal law, and thus we may not grant habeas relief.

*Id*. Thus, in any event, Petitioner's proposed federal claim does not provide him a basis for relief.

Claim one is waived and does not provide a basis for relief.

## III.

## Merits

### Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254. The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations. The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy." *Burt v. Titlow*, 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA. . . imposes a highly deferential standard for

evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct.

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). "Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit has explained these standards as follows:

> A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . . case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent

> to a new context. *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146
> L.Ed.2d 389.

*Coley,* 706 F.3d at 748–49.  The burden of satisfying the standards set forth in § 2254 rests with the petitioner.  *Cullen v. Pinholster*, 563 U.S.170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively unreasonable," not merely "incorrect or erroneous."  *Wiggins v. Smith*, 539 U.S. 510, 520–21, (2003) (internal quotation marks omitted)(citing *Williams v. Taylor*, 529. U.S. at 409 and *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 562 U.S. at 102 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as "'fairminded jurists could disagree' on the correctness of the state court's decision." (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the reasonableness of the state court's analysis.  *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) ("[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not whether the state court considered and discussed every angle of the evidence." (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*)); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013) (considering evidence in the state court record that was "not expressly considered by the state court in its opinion" to evaluate the reasonableness of state court's decision).  Relatedly, in evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a court must review the state court's decision based solely on the record that was before it at the time it rendered its decision.  *Pinholster,* 563 U.S. at 181.  Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did."  *Id.* at 182.

**Claim Three**

In claim three, Petitioner asserts that he was denied a fair trial based on prosecutorial misconduct due to the prosecutor's repeated use of leading questions. The state appellate court rejected this claim as follows:

> [A]ppellant contends that he was denied a fair trial by the prosecutor's continued use of leading questions in his direct examination of the state's witnesses. For example, appellant contends that the prosecutor asked leading questions of Wellington when he laid the foundation for the admission of D.J.'s hearsay statement under the excited utterance standard. Appellant also contends that the prosecutor asked leading questions of Wellington regarding her pretrial telephone conversations with appellant. In appellant's view, the prosecutor's continued use of leading questions rose to the level of prosecutorial misconduct warranting reversal. We disagree.

> Pursuant to Evid.R. 611(C), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." However, "the trial court has discretion to allow leading questions on direct examination." *State v. Thompson*, 141 Ohio St.3d 254, 2014–Ohio–4751, ¶ 166, citing *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190 (1993).

> A prosecutor may be guilty of misconduct if he or she continues to ask leading questions after the trial court has sustained objections to such questioning. *See State v. LaMar*, 95 Ohio St.3d 181, 2002–Ohio–2128, ¶ 149. However, to constitute reversible error, such misconduct must pervade the trial to such a degree that there was a denial of due process. *State v. Diar*, 120 Ohio St.3d 460, 2008–Ohio–6266, ¶ 205.

> Whether a question may be answered "yes" or "no" is not the correct criteria for determining if they were leading questions. *See Netzley v. Nationwide Mut. Ins*. Co., 34 Ohio App.2d 65, 82 (2d Dist.1971); *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, ¶ 138. In fact, a "question to which an answer of yes or no would be conclusive of the matter in issue is not necessarily leading, where the question calls for a direct affirmative or negative answer but is no more suggestive of one than the other." 81 American Jurisprudence 2d, Witnesses, Section 717 (2015). Our review of the trial transcript reveals that the prosecutor

routinely employed closed-ended questions in his direct examination of the state's witness, but that the questions were not always suggestive of the answer desired by the prosecutor.

With regard to Wellington's testimony about her telephone conversations with appellant, we note that Wellington answered "yes" when the prosecutor asked if she felt manipulated and threatened by appellant, but she responded in the negative when he asked her if she felt frightened. Although the prosecutor's questions called for a "yes" or "no" answer, the questions were not leading because they were no more suggestive of one answer than the other. Similarly, with regard to Wellington's testimony about the "startling event" that precipitated D.J.'s incriminating statement about appellant, the mere fact that the questions were closed-ended does not mean that the desired answer was suggested by the question. In short, the record does not fully support appellant's claims about the prosecutor's alleged improper examination techniques.

Appellant also cites the prosecutor's use of leading questions to induce Wellington to supply the meaning of the term "merk," as used by appellant in his telephone conversations with Wellington:

Q. Did the defendant ever say, I should have merked [Appiah] also?

A. Yes, he did.

Q. Are you familiar with the term, merk?

A. Yes

Q. Slang term?

A. Yes

Q. To you is that a slang term for the meaning of kill?

A. Yes

[DEFENSE COUNSEL]: Objection, leading.

(Tr. 664.)

Even though the prosecutor framed the question in terms of what "merk" meant to Wellington, the question arguably suggested the

desired answer and was, therefore, an improper leading question. The trial court sustained the objection and struck the answer from the record. The trial court also encouraged the prosecutor to employ more open-ended queries. The prosecutor rephrased the question by asking Wellington "what does the term merk mean to you?" Wellington answered "[i]t means to kill." (Tr. 665.)

Appellant also cites the following exchange between the prosecutor and Appiah as an example of the improper use of leading questions:

Q. Were you ever made aware of the fact that [Boayke] also had problems with [Owusu]?

A. I didn't know that until, like, actually on the 4th. That's when I found they do have problems with [Owusu].

Q. You mean the day the defendant killed [Owusu]?

A. Yes.

(Emphasis added.) (Tr. 339–40.)

The trial court sustained appellant's objection and ordered the testimony stricken from the record. The trial court also instructed the jury not to consider the answer. The prosecutor moved on to another line of questioning.

As a general rule, when the trial court sustains objections to a leading question and the prosecutor rephrases the question, the defendant is not deprived of a fair trial. *State v. Taylor*, 10th Dist. No. 10AP–939, 2011–Ohio–3162, ¶ 31, citing *State v. Kleekamp*, 2d Dist. No. 23533, 2010–Ohio–1906 (the trial court's repeated sustaining of objections to leading questions and the prosecutor's rephrasing to elicit the same testimony did not deprive the defendant of a fair trial); *State v. Joseph*, 3d Dist. No. 1–9111 (Dec. 23, 1993) (no denial of a fair trial where the trial court sustained defense counsel's objections to leading questions and the prosecutor rephrased the question); *State v. Lorenzano*, 9th Dist. No. 2644 (Aug. 9, 1978) (upon objection, a leading question may be rephrased in one or more questions in non-objectionable form).

While we agree that some of the prosecutor's questions were leading, the record does not support appellant's contention that the prosecutor persisted in using leading questions even after objections had been sustained. Thus, the record does not support a

> claim of prosecutorial misconduct. *Diar* at ¶ 170. Moreover, even if we were to conclude that the prosecutor acted improperly in the examination of the state's witnesses, such misconduct did not pervade the trial to such a degree that there was a denial of due process. *Id*. at ¶ 205.
>
> In short, we hold that the trial court did not abuse its discretion in denying appellant's motion for new trial. *State v. Ross*, 2d Dist. No. 22958, 2010–Ohio–843, ¶ 109. Appellant's fourth assignment of error is overruled.

*State v. Oteng*, 2015 WL 1432556, at *8-10.

The appropriate standard of review for claims of prosecutorial misconduct for a writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). For prosecutorial misconduct to rise to the level of a constitutional violation, the conduct of the prosecutor must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (quoting *Donnelly*, 416 U.S. at 643); *see also Darden*, 477 U.S. at 181. Thus, "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).

When analyzing a claim of prosecutorial misconduct, a federal court must first determine whether the challenged statements were improper. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). If improper, the court must examine whether the statements were so flagrant as to constitute a denial of due process and warrant the granting of a writ. Even if the prosecution's conduct was improper, or even "universally condemned," a federal court can only reverse a conviction or sentence if the statements were so flagrant as to render the entire trial fundamentally unfair. *See e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). A court makes that determination by considering the following four factors: (1) the likelihood that the

remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005); *see also Bowling v. Parker*, 344 F.3d 487, 512–13 (6th Cir. 2003). Relief will not be granted unless the conduct of the prosecutor "likely had a bearing on the outcome of the trial. . . ." *Byrd,* 209 F.3d at 530.

Consideration of the foregoing factors demonstrates that relief is unwarranted. "[A] defendant cannot establish that a prosecutor's use of improper leading questions violated his right to a fair trial where defense objections to the leading questions were sustained." *Graewe v. Williams*, No. 5:10-cv-0506, 2011 WL 3652460, at * (N.D. Ohio May 4, 2011)) (citations omitted)); *see also Glenn v. Warden, Ross Corr. Inst*., No. 1:12-cv-706, 2013 WL 6578768, at *8 (S.D. Ohio Dec. 16, 2013) (noting that a prosecutor's use of leading questions would not provide for federal habeas corpus relief, in view of the lack of United States Supreme Court precedent holding that it is unconstitutional to ask leading questions on direct examination of the prosecution's witnesses.) Further, a prosecutor's use of leading questions does not deprive a criminal defendant of his right to confront the witnesses against him where he had ample opportunity to cross examine the witnesses. *See Storey v. Vasbinder*, No. 06-cv-13194, 2009 WL 3012623, at *13 (E.D. Mich. Sept. 17, 2009) ("The [Confrontation] Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.") (quoting *Crawford v. Washington*, 541 U.S. 36, 59 n.9, (2004)). "In general, the right to confront adverse witnesses is satisfied 'if defense counsel receives wide latitude at trial to question witnesses.'" *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012) (citing

*Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (citing *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

Claim three is without merit.

## Claim Four

In claim four, Petitioner asserts that he was denied the effective assistance of trial counsel, because his attorney failed to obtain a translator to interpret his conversation with Wellington; failed to review the State's evidence, and because counsel failed to object to admission of search warrants, leading questions, other-acts evidence, the admission of hearsay, an erroneous jury instruction on causation, and improper statements by the prosecutor during closing argument. Petitioner claims that the aggregate effect of counsel's inadequate performance denied him the effective assistance of counsel. *Traverse* (ECF No. 17, PageID# 1452-54.) The state appellate court denied this claim as follows:

> [A]ppellant argues that he received ineffective assistance of counsel. In order to prevail on a claim of ineffective assistance of counsel, a defendant must show that trial counsel's performance fell below an objective level of reasonable representation and that the defendant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668 (1984).
>
> Appellant argues that trial counsel was ineffective in several respects. First, appellant argues that trial counsel provided ineffective assistance to appellant by failing to employ a qualified foreign language interpreter to translate the conversations between appellant and Wellington. However, as stated in connection with appellant's first assignment of error, a foreign language interpreter was not required under the circumstances. Additionally, there is nothing in the record to suggest that Wellington's translation was inaccurate.
>
> Appellant next contends that trial counsel provided ineffective assistance to appellant by failing to conduct a pretrial review of the tape-recorded telephone conversations between appellant and Wellington. Appellant cites the following colloquy as evidence of trial counsel's inadequate review:

Q. And one of the things I noticed is that never in any of your discussions with him on the phone do you say, I can't believe you did it, I can't believe you shot him, why would you do that, I'm in shock at what you did. You never say anything like that in any of the conversations. True?

A. No. That's not true.

Q. So—you actually say that in those recordings?

A. Oh, not those recordings, but other recordings I have.

(Tr. 687–88.)

Our review of the transcript reveals that trial counsel asked only about the tape-recorded telephone conversations that the state had played for the jury during Wellington's direct examination, but that Wellington referred to other tape-recorded telephone conversations in her response. Contrary to appellant's claim, the colloquy does not show that trial counsel failed to review all of the tape-recorded telephone conversations.

To the extent that appellant claims that his trial counsel performed poorly by failing to object to the allegedly improper remarks made by the prosecutor in closing argument and the prosecutor's continuous use of leading questions, we note that defense counsel's failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision." (Emphasis sic.) *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995). Furthermore, we have already concluded that a timely objection on the grounds of prosecutorial misconduct would not likely have been successful. Thus, trial counsel was not ineffective for failing to raise those objections.

With regard to the admission of hearsay testimony, we have determined either that the testimony was admissible pursuant to a recognized hearsay exception or that the outcome of the trial would not have been different if trial counsel had timely objected. Consequently, appellant cannot satisfy the second prong of the *Strickland* test. Similarly, as noted in connection with our discussion of appellant's fifth and sixth assignments of error, a timely objection to the "other-acts evidence" and the evidence regarding search warrants would likely have failed. (Appellant's Brief, 37.) Thus, trial counsel was not ineffective for failing to raise those objections.

> Finally, appellant argues that even if we conclude that none of the above counsel's errors are serious enough, standing alone, to justify reversal due to ineffective assistance of counsel, his trial counsel's many errors, when considered together, deprived him of a fair trial. However, as we have previously concluded that trial counsel either did not err in the manner alleged by appellant or that counsel's errors did not affect the outcome of the trial, we find no merit in appellant's cumulative error theory. Accordingly, appellant's ninth assignment of error is overruled.

*Oteng*, 2015 WL 1432556, at 17-18.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that counsel's performance was deficient, or that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment, and that this deficient performance prejudiced the petitioner. *Id.* at 687. This showing requires that defense counsel's errors were so serious as to deprive the defendant of a fair and reliable trial. *Id.*

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 599 U.S. 356, 371 (2010). Given the difficulties inherent in determining whether an attorney's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . ." *Strickland*, 466 U.S. at 689. Nevertheless, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. In order to establish prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id*. Because a petitioner must satisfy both prongs of *Strickland* in order to demonstrate the ineffective assistance of counsel, should a court determine that the petitioner has failed to satisfy one prong, it need not consider the other. *Id*. at 697.

Nothing in the record reflects that, had defense counsel obtained an interpreter for translation of portions of Petitioner's recorded telephone conversation with Wellington, that it would have assisted the defense. Likewise, the record does not support Petitioner's claim that defense counsel failed to conduct an adequate review of the evidence and again, Petitioner does not indicate, and the record does not reflect, the manner in which Petitioner was prejudiced thereby.

As to Petitioner's claim that his attorney performed in a constitutionally ineffective manner by failing to object to improper statements of the prosecutor during closing argument, the appellate court found that the complained of statements were not improper and did not prejudice the Petitioner:

> [A]ppellant claims that the prosecutor committed misconduct in closing argument. Specifically, appellant contends that the prosecutor acted improperly when he stated that several of the state's witnesses were "telling the truth" when he referred to appellant as a "good criminal" and when he implied that appellant had disposed of evidence after speaking with an attorney. (Appellant's Brief, 42–43 .) Appellant's trial counsel did not object to the closing argument.
>
> ***
>
> "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Davis*, 116 Ohio St.3d 404, 2008–Ohio–2, ¶ 229. Our review of the argument reveals that the prosecutor made the claim that the state's witnesses were telling the truth only in the context of the evidence presented at trial, not in the context of his knowledge of facts outside the record or his personal belief. As such, the prosecutor did not vouch for the credibility of his witnesses.

Prosecutors are normally given wide latitude in their closing arguments. *State v. Maurer*, 15 Ohio St.3d 239 (1984). During closing arguments, the prosecution is free to comment upon "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott,* 51 Ohio St.3d 160, 165 (1990). Here, the prosecutor made his comment about appellant seeking advice of an attorney in an effort to explain why appellant called Kusi on the telephone just hours after the shooting and told him "[I] shot him" and yet changed his story the next day. (Tr. 816.) Kusi had testified at trial that appellant recanted his prior admission after informing Kusi that he had spoken with legal counsel and intended to turn himself in to police.

In appellant's closing, his trial counsel argued that the lack of corroborating forensic evidence gave rise to a reasonable doubt. Given appellant's theory of the case and in light of Kusi's testimony, we cannot say that the prosecutor's comments were improper. The same logic holds true for the prosecutor's comment that appellant is a "good criminal." The record shows that the prosecutor made the comments in the state's rebuttal and only after appellant's trial counsel questioned the state's lack of corroborating forensic evidence. Moreover, given the overwhelming evidence of appellant's guilt, we cannot say that the impropriety of the prosecutor's argument, if any, affected the outcome of the trial.

*State v. Oteng*, 2015 WL 1432556, at *16-17. For the reasons previously discussed, Petitioner likewise cannot establish prejudice from his attorney's failure to object to the prosecutor's use of these statements. He has therefore failed to establish the denial of the effective assistance of counsel on this basis.

The appellate court similarly rejected Petitioner's claims regarding the improper admission of evidence regarding execution of search warrants, other acts evidence, hearsay testimony, and improper jury instructions, concluding either that such evidence was properly admitted at trial, or that it did not materially prejudice the defense. The appellate court stated:

Appellant has not cited, nor has the court found in its own research, a single case from this or any other Ohio court holding either that evidence regarding search warrants issued during the

investigation of a crime is, per se, inadmissible as evidence at the trial of the matter or that the erroneous admission of such evidence deprives a criminal defendant of his or her statutory and constitutional right to the presumption of innocence. Moreover, appellant does not contend that the trial court failed to properly instruct the jury regarding the presumption of innocence and the burden of proof. We are to presume that the jury followed the trial court's instructions. *State v. Hancock*, 108 Ohio St.3d 57, 2006–Ohio–160.

*State v. Oteng*, 2015 WL 1432556, at *5. Additionally, the appellate court held as follows:

[A]ppellant contends that the trial court erred when it permitted the state to introduce specific instances of appellant's prior "bad acts" in an effort to prove that appellant had both a grudge against the victim and that he was a bad father.

Kusi testified that, prior to the shooting incident, appellant had informed him that he and Owusu "were not on good terms" and that there had been problems between the two on "more than one occasion before January 5th of 2013." (Tr. 813.) Kusi was not asked to elaborate nor did he provide any specifics regarding these occasions.

Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added.) The state made no attempt to use the evidence of appellant's bad feelings toward Owusu as proof of anything other than appellant's motive to harm him. As such, the admission of the testimony did not violate Evid.R. 404(B). *See, e.g., State v. Harris*, 10th Dist. No. 09AP–578, 2010–Ohio–1688, ¶ 21; *State v. Bethel*, 110 Ohio St.3d 416, 2006–Ohio–4853, ¶ 174.

With regard to Wellington's testimony that it was "unusual" for appellant to come over to her apartment and ask to see his daughter, we do not agree with appellant that such testimony necessarily requires the inference that appellant is a bad father.

\*\*\*

[A]ppellant claims that the trial court erroneously instructed the jury regarding causation and that the erroneous instruction unfairly

prejudiced his defense. Appellant failed to object to the causation instruction at trial, and he has waived all but plain error for purposes of appeal. *State v. Phillips*, 10th Dist. No. 14AP–79, 2014–Ohio–5162, ¶ 165, citing Crim.R. 30.

In *State v. Burchfield*, 66 Ohio St.3d 261 (1993), the trial court, in a murder case, instructed the jury as follows:

The causal responsibility of the defendant for an unlawful act is not limited to its immediate or most obvious result. He is responsible for the natural, logical and foreseeable results that follow, in the ordinary course of events, from an unlawful act.

The test for foreseeability is not whether the defendant should have foreseen the injury in its precise form or as to a specific person. The test is whether a reasonably prudent person in the light of all the circumstances would have anticipated that death or injury or physical harm was likely to result to anyone from the performance of the unlawful act or failure to act.

(Emphasis added.) *Id*. at 261–62.2

The Supreme Court in *Burchfield* questioned the use of foreseeability instruction in a murder case given the potential to mislead jurors regarding the state's burden of proof. *Id.* at 263. However, the Supreme Court has also stated that "[t]he use of that [language] does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips*, 74 Ohio St.3d 72, 100 (1995).

The causation instruction given to the jury in this case reads in relevant part as follows:

Before you can find the defendant guilty of murder, you must find the State has proved beyond a reasonable doubt that on or about the 5th day of January, 2013, in Franklin County, Ohio, the defendant purposely caused the death of [Owusu].

A person acts purposefully when it is his specific intention to cause a certain result. To do an act purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. Since you cannot look into the mind of another, you must determine purpose from all the facts and circumstances in evidence.

\* \* \*

Cause is an act or failure to act which in the natural and continuous sequence directly produces the death and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act or failure to act.

(Emphasis added.) (Tr. 961–62.)

Although the trial court used the term "foreseeable" in its causation instruction, the instructions as a whole make clear that the jury must find purpose to kill in order to convict. Consequently, the alleged error in the causation instruction does not rise to the level of plain error. *See State v. Powell*, 132 Ohio St.3d 233, 2012–Ohio–2577, ¶ 167 (causation instruction that defendant was responsible "for the natural and foreseeable consequences that follow, in the ordinary course of events, from the unlawful act," was not reversible error, where the trial court had properly instructed the jury regarding the state's burden of proof).

For the foregoing reasons, appellant's [] assignment of error is overruled.

*State v. Oteng*, 2015 WL 1432556, at \*11-12.

[A]ppellant claims that the trial court denied him a fair trial by admitting hearsay statements that unfairly prejudiced his defense. We disagree.

"'[T]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court.'" *State v. Robb*, 88 Ohio St.3d 59, 68 (2000), quoting *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. Absent an abuse of discretion, as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of evidence. *State v. Jewett*, 10th Dist. No. 11AP–1028, 2013–Ohio–1246, ¶ 52, citing *State v. Martin*, 19 Ohio St.3d 122, 129 (1985).

The first example of hearsay evidence cited by appellant is Wellington's testimony regarding an incriminating statement allegedly made by D.J. just seconds after the shooting. Wellington testified that when she was kneeling next to Owusu as he lay dying in the parking lot, she heard a man named D.J. screaming at appellant "you shot him, get in the car." (Tr. 647.)

The trial court admitted Wellington's testimony, over appellant's objection, under the "excited utterance" exception to the hearsay rule. In order to admit a statement as an excited utterance under Evid.R. 803(2), four elements must be satisfied: (1) an event startling enough to create nervous excitement in the declarant, (2) the statement must be made while the declarant was still in a state of excitement created by the startling event, (3) the statement must relate to the startling event, and (4) the declarant must have personally observed the event. *State v. Garrison*, 10th Dist. No. 05AP–603, 2006–Ohio–6142, ¶ 17, citing *State v. McKenzie*, 8th Dist. No. 87610, 2006–Ohio–5725, ¶ 29. "'[T]he decision of the trial judge, in determining whether or not a declaration should be admissible under the spontaneous exclamations exception to the hearsay rule, should be sustained where such decision appears to be a reasonable one, even though the reviewing court, if sitting as a trial court, would have made a different decision.'" *State v. Duncan*, 53 Ohio St.2d 215, 219 (1978), quoting *Potter v. Baker*, 162 Ohio St. 488, 500 (1955).

According to Wellington, after Osuwu was shot, the scene outside the Fillipino Center became chaotic, with people running, screaming, and crying. According to Wellington, when D.J. made the statement incriminating appellant, he was very near to Osuwu as he lay dying in her arms. Wellington testified that D.J. appeared distressed and agitated as he screamed at appellant. Based upon this testimony, it is reasonable to conclude that D.J. made the incriminating statement during an event startling enough to create nervous excitement, that he made the statement while he was in a state of excitement created by the startling event, that the statement identified appellant as the cause of the startling event, and that he personally observed the event. We find no abuse of discretion on the part of the trial court in ruling that D.J.'s statement was an excited utterance under Evid.R. 803(2) and admitting Wellington's testimony over appellant's objection.

Appellant next contends that Aseidu's statement about seeing appellant "downtown" is inadmissible hearsay. Although defense counsel later moved for a mistrial based upon Wellington's unsolicited disclosure that appellant was in jail prior to trial, counsel never objected to the testimony on the grounds of inadmissible hearsay. Accordingly, we review the matter under the plain error standard. *Humberto* at ¶ 28. As we have previously concluded that appellant could not have been materially prejudiced by the admission of Wellington's unexpected reference to appellant's incarceration, we find no plain error.

Appellant also takes exception to d'Almeida's testimony regarding a brief conversation that took place between appellant and Aseidu just prior to the shooting. d'Almeida testified as follows:

A. After [appellant] reached in he walked up to my car and spoke to [Aseidu] and asked him if he was with them.

* * *

Q. Okay. And what was [Aseidu's] response?

A. He said, get the F away from us with this BS; like, you need to chill.

(Tr. 552.)

. . . . In our view, Aseidu's statement arguably qualifies as an excited utterance. At the time Aseidu allegedly made the statement at issue, a violent confrontation had taken place between Boayke and G-money, appellant had already fired at least one shot from a handgun, and he was standing at Aseidu's car door holding a handgun. d'Almeida testified that she observed these events from inside the parked vehicle in which she and Aseidu were seated.

Moreover, even if Aseidu's statement was inadmissible hearsay, the statement tends to show only that appellant was involved in the altercation and seeking support; the statement does not necessarily implicate him in the murder of Owusu. Consequently, the prejudice to appellant from the hearsay statement is relatively insubstantial[.]

*State v. Oteng*, 2015 WL 1432556, at *7-8.

As described fully by the state court, Petitioner cannot demonstrate that his counsel's performance was deficient, or that he "made errors so serious that he was not functioning as the 'counsel' guaranteed" by the Sixth Amendment which prejudiced the Petitioner. *Id*. at 687. Therefore, Petitioner has failed to meet the two-prong test under *Strickland* based on his counsel's performance.

Establishing a claim of ineffective assistance of counsel in a habeas case is difficult.

> The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is 'doubly' so, *Knowles*, 556 U.S., at 123, 129 S.Ct., at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123 [129 S.Ct., at 1420]. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland 's* deferential standard."

*Premo v. Moore*, 562 U.S. 115, 122-23 (2011). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). For the reasons set forth above, Petitioner has failed to meet this standard here.

Claim four is without merit.

## IV.

## Recommended Disposition

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## V.

## Procedure on Objections

If any party objects to this *Report and Recommendation*, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is

made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

_s/ Elizabeth A. Preston Deavers_
Elizabeth A. Preston Deavers
United States Magistrate Judge